UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------X
JAMES KILKENNY, et al., as TRUSTEES
of the CONSTRUCTION COUNCIL LOCAL
175 PENSION FUND; JAMES KILKENNY,
et al., as TRUSTEES of the
CONSTRUCTION COUNCIL LOCAL 175
WELFARE FUND; JAMES KILKENNY, et al.,
as TRUSTEES of the CONSTRUCTION
COUNCIL LOCAL 175 ANNUITY FUND; and
JAMES KILKENNY, et al., as TRUSTEES
of the CONSTRUCTION COUNCIL LOCAL
175 TRAINING FUND,

                Plaintiffs,

                                   <u>MEMORANDUM & ORDER</u>
      -against-                  18-CV-7197(JS)(AKT)

GOLD COAST PAVERS, INC.,

                Defendant.
-----------------------------------X
APPEARANCES

For Plaintiffs:             Elise S. Feldman, Esq.
                          Rothman Rocco Laruffa, LLP
                          3 West Main Street, Suite 200
                          Elmsford, New York 10523

For Defendant:              Richard B. Ziskin, Esq.
                          The Ziskin Law Firm, LLP
                          6268 Jericho Turnpike, Suite 12A
                          Commack, New York 11725

SEYBERT, District Judge:

        James Kilkenny, in his capacity as trustee and fiduciary

of four employee benefit plans ("Plaintiffs"), commenced this

action against Gold Coast Pavers, Inc. ("Gold Coast" or

"Defendant") asserting violations of the Employee Retirement

Income Security Act of 1974, 29 U.S.C. §§ 1001, <u>et seq.</u> ("ERISA").

Currently pending before the Court is Plaintiffs' motion for summary judgment. (Pls. Mot., ECF No. 29; Def. Opp., ECF No. 36; Pls. Reply, ECF No. 38.)  For the following reasons, Plaintiffs' motion is DENIED.

FACTUAL BACKGROUND[1]

The following facts, unless otherwise noted, are undisputed.

## I.   The Parties

Plaintiffs are trustees of the Construction Council Local 175 Pension Fund; the Construction Council Local 175 Welfare Fund; the Construction Council Local 175 Annuity Fund; and the Construction Council Local 175 Apprenticeship, Skill Improvement and Training Fund (the "Funds").  The Funds are employee benefit plans within the meaning of ERISA § 3(3), 29 U.S.C. § 1002(3), maintained for the purpose of collecting and receiving contributions and providing various benefits to qualified participants and their dependents. (56.1 Stmt. ¶ 5.)  The Funds were established pursuant to the terms of various collective bargaining agreements ("CBAs") between Local 175, a labor organization, and employers who are required to make contributions

---

[1] The facts are drawn from the parties' briefing and Plaintiffs' Local Rule 56.1 Statement with Defendant's responses. (Plaintiffs' 56.1 Statement of Material Facts & Defendant's Responses ("56.1 Stmt."), ECF No. 35.)

to the Funds on behalf of their employees covered by the CBAs. (Id. ¶ 7.)

Defendant is a small residential paving company owned and operated by Crescenzo Stasi ("Stasi").   (Id. ¶ 8; see also Stasi Depo. Tr. at 13-14, Ex. E, ECF No. 30-5, attached to Feldman Decl.)

II.   The Assumption Agreements

In late 2013, Stasi was looking to venture into public or municipal work.   (56.1 Stmt. ¶ 45; Stasi Depo. Tr. at 24:21-25.)   Sometime in early 2014, Gold Coast bid on a Town of Hempstead road restoration project (the "Hempstead Project") -- "a large project for Gold Coast" -- and received the low bid award.   (56.1 Stmt. ¶¶ 46-47; Stasi Depo. Tr. at 29:13-21, 31:14-16.)   In order to obtain project approval, Gold Coast needed to enroll its workers in a New York State Department of Labor approved Apprentice Training program, among other threshold requirements.   (56.1 Stmt. ¶ 47; Stasi Depo. Tr. at 30-31; Stasi Decl. ¶ 6, ECF No. 33.) Knowing Local 175 had an apprenticeship program, Stasi reached out to Roland Bedwell ("Bedwell"), Local 175's business manager at the time.   (56.1 Stmt. ¶¶ 48-49.)

On April 3, 2014, Stasi and Bedwell met at a restaurant on Northern Boulevard to discuss the Hempstead Project.   (56.1 Stmt. ¶ 50; Stasi Depo. Tr. at 34:20-21.)   Stasi testified the meeting lasted from forty-five minutes to an hour.   (Stasi. Depo.

3

Tr. at 35:7-18.)   At this meeting, Stasi signed two agreements on behalf of Gold Coast: the Nassau/Suffolk Paving Division Assumption Agreement, and the Paving Division Assumption Agreement (the "Assumption Agreements").[2]   In signing the Assumption Agreements, Stasi believed that he was signing an agreement to join Local 175's apprenticeship program, either a job-site (or single-project) agreement with Local 175 for the Hempstead Project, or a document that would lead to a job-site agreement. (Stasi Depo. Tr. at 42:10-13 ("I don't know recollect [sic] whether he was telling me this was the job site agreement and/or this was going to lead to the job site agreement."); Stasi Decl. ¶¶ 11, 14.)  This belief was based on representations Bedwell made during their meeting.  (Id. at 36:4-11 (recalling Bedwell saying, "Sign this so I can get you your job agreement and get your guys their books into the apprenticeship program"); Stasi Decl. ¶¶ 14, 21-22.)  According to Stasi, he never intended to sign onto the CBA with Local 175.  (Stasi Decl. ¶ 34.)

Contrary to Stasi's alleged belief, however, the Assumption Agreements were not single-project agreements, but rather, short-form contracts binding Gold Coast to a full-blown collective bargaining agreement (the "Alliance CBA") not limited

---

[2] The Assumption Agreements are identical in all material respects. (See Assumption Agreements, Exs. E, F, ECF Nos. 31-5, 31-6, respectively, attached to Priolo Decl.)

in scope to the Hempstead Project.  Pursuant to the Assumption
Agreements and as relevant here, Gold Coast agreed to be bound by
the Alliance CBA, which was incorporated by reference into the
Assumption Agreements.  Gold Coast also agreed "to be responsible
for the payment of fringe benefit contributions" owed under the
Alliance CBA.

      Stasi's testimony regarding whether he read the
Assumption Agreements when he signed them is ambiguous.  He
equivocated that he did not remember whether he read it, but also
that he "did read it," or "may have read it thoroughly and not
understood it."  (Stasi Depo. Tr. at 37:12-23.)  In the sworn
declaration he submitted in opposition to Plaintiffs' summary
judgment motion, Stasi states that "Bedwell did not give me an
opportunity to read and review [the Assumption Agreements]."
(Stasi Decl. ¶ 23.)  Moreover, while Stasi "acknowledge[d] receipt"
of the Alliance CBA by signing the Assumption Agreements, he avers
that he never received a copy of it, let alone copies of the
Assumption Agreements.  (Stasi Depo. Tr. at 33:22, 34:7-8, 53:5-
55:19; Stasi Decl. ¶ 23, 25-26.)  Stasi further describes Bedwell
as a "big man" who on the day they met "painted a picture for me
of what he's capable of," or his "influence."  (Stasi Depo. Tr. at
58:13-17, 60:7; Stasi Decl. ¶ 20.)  As Stasi testified, these
capabilities included stopping construction jobs that did not use
Local 175 members.  (Stasi Depo. Tr. at 58:20-25; Stasi Decl. ¶¶

15, 17.)  Stasi claims that he "felt pressure [that] if I didn't sign the [Assumption Agreements] that I wasn't getting the [Hempstead Project] at all." (Stasi Depo. Tr. at 38:11-13; id. at 59:11-18; Stasi Decl. ¶¶ 18-19.)  According to Defendant, Stasi's version of events is supported by the fact that in 2018 Bedwell pleaded guilty to one count of extortion in violation of the Hobbs Act for securing wages and employee benefits paid pursuant to labor contracts with Local 175 through actual and threatened force, violence, and fear.  (Def. Opp. at 9-11 (describing Bedwell's indictment and subsequent guilty plea).)[3]

Gold Coast secured the Hempstead Project and completed it within five weeks.  (Stasi Decl. ¶ 29.)  Nevertheless, Gold Coast's employees, including Stasi, never received "documentation" regarding their admission to Local 175's apprenticeship program, although Stasi testified that he received "a card in the mail with my name on it." (Stasi Depo. Tr. at 32:24-33:6; id. at 36:13-37:3; Stasi Decl. ¶ 27.)  Stasi further testified that he received no "correspondence from the Local 175 funds" after signing the Assumption Agreements.  (Stasi Depo. Tr. at 43:21-25.)  In addition, Gold Coast never received invoices from the Funds beyond "the annual fees to keep the books active." (Id. at 43:10-15.)

---

[3] There is no indication in the record, and Defendant does not so claim, that the conduct for which Bedwell was indicted relates to the Assumption Agreements in this case.

6

Beyond these limited exchanges, it does not appear that Gold Coast had any communication with Local 175 or Bedwell until the Funds' auditors reached out sometime in 2016 to request Gold Coast's books and records to perform an audit.  (56.1 Stmt. ¶ 67; Payroll Compliance Exam, Ex. I, ECF No. 31-9, attached to Priolo Decl.) Gold complied with the audit, which covered the period between April 1, 2014 and December 31, 2015.  (56.1 Stmt. ¶ 67; Stasi Depo. Tr. at 44:16-45:4; Stasi Decl. ¶¶ 30-31.)  According to the audit, Gold Coast paid approximately 168 hours' worth of contributions to the Local 176 Funds, leaving 8,161 hours unpaid.  (56.1 Stmt. ¶¶ 68-78; see also Payroll Compliance Exam, Ex. I, at 8.)  After the books and records request, but before Gold Coast received the audit results, Defendant received an invoice for $10,000 from Bedwell. (Stasi Depo. Tr. at 47:13-48:13.)  According to Stasi, Bedwell told him that Gold Coast "would get audited" if it didn't pay the sum.  (Id. at 61:24-62:2.)  Stasi discussed the invoice with his accountant but never paid the sum.  (Id. at 48:3-17.)

Gold Coast did not perform any public or municipal work after the Hempstead Project, its first and last municipal project. (Stasi Depo. Tr. at 42:19-43:7; Stasi Decl. ¶ 30.)

## PROCEDURAL BACKGROUND

Plaintiffs commenced this action on December 18, 2018, under ERISA Sections 502(a)(3) and 515 (29 U.S.C. §§ 1132(a)(3), 1145), seeking to collect unpaid benefit fund contributions, plus

7

interest, liquidated damages, audit fees, attorney's fees, and other collections costs. (See Compl., ECF No. 1.) Plaintiffs now seek summary judgment for these damages, contending that none of Defendant's asserted defenses are viable under ERISA and that the Plaintiffs are therefore entitled to judgment as a matter of law. Defendant contends that it has a valid fraud-in-the-execution defense that precludes summary judgment.

DISCUSSION

I.   Legal Standard

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Material facts are those which might affect the outcome of the suit under the governing law, and a dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Wagner v. Chiari & Ilecki, LLP, 973 F.3d 154, 164 (2d Cir. 2020) (quoting Coppola v. Bear Stearns & Co., 499 F.3d 144, 148 (2d Cir. 2007)) (internal quotation marks omitted). The movant bears the burden of establishing that there are no genuine issues of material fact for trial. Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial," as Defendant does here on its defense, "the movant may satisfy this burden by pointing to an

8

absence of evidence to support an essential element of the nonmoving party's claim." Gummo v. Vill. of Depew, 75 F.3d 98, 107 (2d Cir. 1996) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Hetchkop v. Woodlawn at Grassmere, Inc., 116 F.3d 28, 33 (2d Cir. 1997). Moreover, "the court is not to make assessments of the credibility of witnesses" on a motion for summary judgment, as "[c]redibility assessments, choices between conflicting versions of events, and weighing of the evidence are matters for the jury." Id.

On a motion for summary judgment the Court considers the "pleadings, deposition testimony, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011). In reviewing the record, "the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Sheet Metal Workers' Nat'l Pension Fund v. Vadaris Tech. Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)). When drawing inferences from evidence in the record in favor of the non-moving party, however,

a court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." Berk v. St. Vincent's Hosp. & Med. Ctr., 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (quoting County of Suffolk v. Long Island Lighting Co., 907 F.2d 1295, 1318 (2d Cir. 1990)).

II. Analysis

The sole issue before the Court is whether Defendant has raised a triable issue of material fact as to its fraud-in-the-execution defense. Plaintiff asserts Defendant has not raised a valid defense under ERISA, arguing primarily that Defendant has failed to substantiate its fraud-in-the-execution defense beyond offering "contradictory and self-serving testimony" from Stasi. (Pls. Mot. at 10; see also id. at 10-13; Pls. Reply at 2-7.) Defendant counters that whether Stasi had a reasonable opportunity to know the character and essential terms of the Assumption Agreements (and underlying CBA) before signing them is a question of fact that must be determined at trial, where not only Stasi but also presumably Bedwell, who was not deposed, can testify.[4]  For the reasons that follow, the Court agrees with Defendant.

A.   Fraud-in-the-Execution Defense under ERISA

Section 502 of ERISA gives trustees "the authority to sue to enforce an employer's obligations to a plan." Cent. States,

_____

[4] Bedwell was released from federal custody on August 13, 2021.

10

Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc., 472 U.S. 559, 578-79 (1985) (citing 29 U.S.C. § 1132); see also Connecticut v. Physicians Health Servs. of Conn., Inc., 287 F.3d 110, 113 (2d Cir. 2002) (noting that Section 502 "allows 'a participant, beneficiary, or fiduciary' of an ERISA-regulated plan to bring a civil action for injunctive and other equitable relief"). Section 502 provides:

> In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan --
>
> (A) the unpaid contributions,
>
> (B) interest on the unpaid contributions,
>
> (C) an amount equal to the greater of --
>
>    (i) interest on the unpaid contributions, or
>
>    (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),
>
> (D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and
>
> (E) such other legal or equitable relief as the court deems appropriate.

29 U.S.C. § 1132(g)(2).  Section 515 of ERISA further provides:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a

11

> collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. "The courts of appeals that have construed section 515 have unanimously regarded it as a limitation on the defenses available to an employer when sued by an employee benefit plan." Benson v. Brower's Moving & Storage, Inc., 907 F.2d 310, 314 (2d Cir. 1990).

As a result, the Second Circuit recognizes two defenses to a claim under Section 515: "(1) that the pension contributions themselves are illegal, and (2) that the collective bargaining agreement is void (not merely voidable)." Id. (first citing Kaiser Steel Corp. v. Mullins, 455 U.S. 72, 86-88 (1982); then citing Operating Eng'rs Pension Trust v. Gilliam, 737 F.2d 1501, 1503-05 (9th Cir. 1984), and Southern California Retail Clerks Union and Food Employers Joint Trust Fund v. Bjorklund, 728 F.2d 1262, 1265-66 (9th Cir. 1984)). "To succeed with respect to the defense that a collective bargaining agreement is void, a defendant must demonstrate fraud in the execution of the collective bargaining agreement; 'the defense of fraud in the inducement is not available' in an action under Section 515," because it would render the CBA voidable, rather than void. Teamsters Loc. 456 Pension, Health & Welfare, Annuity, Educ. & Training, Indus. Advancement & Legal Servs. Funds v. CRL Transportation, Inc., No. 18-CV-2056,

2019 WL 3960099, at *4 (S.D.N.Y. Aug. 22, 2019) (quoting Trustees
of ALA-Lithographic Pension Plan v. Crestwood Printing Corp., 141
F. Supp. 2d 406, 410 n.1 (S.D.N.Y. 2001)).  "Fraud in the execution
arises when a party executes an agreement with neither knowledge
nor reasonable opportunity to obtain knowledge of its character or
its essential terms.  Fraud in the inducement occurs when a party
is induced to assent to something he otherwise would not have."
Crestwood Printing Corp., 141 F. Supp. 2d at 410 n.1; see also
RESTATEMENT (SECOND) OF CONTRACTS § 163 comment a.

         Thus, fraud in the execution occurs where there is a
(1) "misrepresentation as to the character or essential terms of
a proposed contract," and (2) a party signs without knowing or
having a "reasonable opportunity to know of its character or
essential terms."  Hetchkop, 116 F.3d at 31.  In order to prevail
on such a defense, a party must show "excusable ignorance of the
contents of the writing signed."  Id. at 32 (quoting Agathos v.
Starlite Motel, 977 F.2d 1500, 1505 (3d Cir. 1992)).  The defense
applies where, for example, "a party secretly substitute[s] one
type of document for another," or substitutes a document of the
same kind but with terms that are materially different from those
to which the party had agreed.  Id. (quoting Connors v. Fawn Mining
Corp., 30 F.3d 483, 491 (3d Cir. 1994)).  At trial, Defendant will
bear the burden of proof on its fraud-in-the-execution defense.
Id.

B.   <u>Application</u>

The Court concludes that there is a triable question of fact as to whether Defendant's fraud-in-the-execution defense applies, thus precluding summary judgment.  On the current record, there are genuine disputes as to material facts that bear on how to characterize Defendant's defense -- whether as fraud in the execution or fraud in the inducement -- and therefore whether the defense is available to defeat this collection action.  Resolving all ambiguities and drawing all permissible factual inferences in favor of Defendant, the Court is unable to conclude as a matter of law that Defendant executed the Assumption Agreements with knowledge of their essential terms.  Rather, a reasonable factfinder could conclude that Stasi believed he was signing a fundamentally different agreement -- a job-site agreement, or an apprenticeship agreement or some preliminary agreement thereto -- instead of the one he actually signed -- an assumption agreement to the CBA, which he never received -- and that he did so based on Bedwell's misrepresentations as to the very character of the Assumption Agreements.  <u>See</u> <u>Gilliam</u>, 737 F.2d at 1504-05 (affirming district court's conclusion that employer was not obligated to make benefit contributions to union benefit funds where union agent did not tell employer that any of the forms presented for signing involved a short-form agreement that would bind the employer to a CBA, the employer did not read the documents, but that "[u]nder

14

the circumstances, [the employer] reasonably and justifiably
thought the documents involved [were] only an application for union
membership"). Further, a reasonable factfinder could find that
Stasi lacked a reasonable opportunity to learn of the Assumption
Agreements' essential terms, either due to pressure from Bedwell
to sign them or from the fact that Bedwell did not provide Stasi
with the underlying CBA. See MZM Constr. Co., Inc. v. N.J. Bldg.
Laborers Statewide Benefit Funds, 974 F.3d 386, 404-05 (3d Cir.
2020).

By use of an illustrative example, the Third Circuit
explained the distinction between the fraud-in-the-inducement and
fraud-in-the-execution defenses:

> [I]f a party misrepresents that the price of
> cheese will increase to induce someone into
> signing a contract to buy milk in bulk, that
> is fraud in the inducement. But if a party
> assures its counterparty that it is signing a
> contract for cheese when it is in fact a
> contract for milk, that is fraud in the
> execution.

MZM Constr. Co., 974 F.3d at 405. As the illustration makes clear,
the distinction between inducement and execution is decisive in
determining whether there is a misrepresentation as to the
fundamental character or essential terms of a contract, or some
lesser misrepresentation as to the contract's scope. Applying the
distinction here, if Bedwell misrepresented the scope of the
Assumption Agreements (i.e., the price of cheese), but Stasi

15

generally understood that he was agreeing to be bound by and make contributions to the CBA (i.e., buying milk in bulk), then Defendant raises fraud in the inducement.[5] But if, on the other hand, Bedwell assured Defendant that it was signing an apprenticeship or job-site agreement containing no or fundamentally different obligations under the CBA (i.e., the

---

[5] The Ninth Circuit's decision in Bjorklund, cited favorably by the Second Circuit, outlines the fraud-in-the-inducement defense. See Hetchkop, 116 F.3d at 34 (citing Bjorklund, 728 F.2d 1262). In Bjorkland, the defendant argued that the union representative "induced him into entering the initial agreement by misrepresenting his eligibility for a pension under the agreement," i.e., the defendant understood the nature of the agreement, but was misled as to the scope of its obligation thereunder. Bjorklund, 728 F.2d at 1265-66; see also Yantch, 316 F. Supp. 2d 130, 140 (N.D.N.Y. 2003) ("That [the defendant] may have been mistaken or misled as to the scope of [the] obligation does not change the fact that he knew of the obligation in general."); Southwest Administrators, Inc. v. Rozay's Transfer, 791 F.2d 769, 774-75 (9th Cir. 1986) (holding the defendant raised fraud in the inducement, rather than fraud in the execution, where it "acknowledged at trial that [it] was fully aware that the document [it] signed was a collective bargaining agreement" that obligated it to make contributions and only claimed the union misrepresented "whether the express provisions of the agreement would in fact be enforced"); Agathos, 977 F.2d at 1502-03, 1506 (finding defendant failed to allege fraud in the execution, as opposed to fraud in the inducement, where union represented orally that defendant would only need to make contributions for two employees under collective bargaining agreement despite agreement's terms to the contrary); CRL Transportation, Inc., 2019 WL 3960099, at *6 (finding the defendant's allegations "would establish only fraudulent inducement," not fraud in the execution, where the defendant claimed it was "misled with respect to the scope of the salt contract" but recognized at the time of signing that he "was signing a contract with the [U]nion" that "required him to contribute to the [F]unds" (alterations in original and internal quotations omitted)).

16

cheese), when it was in fact signing onto the CBA (_i.e._, the milk), then Defendant raises fraud in the execution.[6]

Here, Stasi's declaration and deposition testimony, if credited, provide evidence from which a reasonable factfinder could infer that Bedwell misrepresented the fundamental character of the Assumption Agreements. See Hetchkop, 116 F.3d at 33.  To do so, it is necessary to assess, at a minimum, Stasi's demeanor. See generally United States v. Crandall, 748 F.3d 476, 483 (2d Cir. 2014) (noting that a "Court of Appeals must accord great deference to the trial court's findings regarding credibility because the trial judge is in the best position to evaluate a witness's demeanor and tone of voice as well as other mannerisms that bear heavily on one's belief in what the witness says" (citations omitted)).  Further, a reasonable factfinder could find support in the record for an inference of fraud in the execution

---

[6] The Ninth Circuit's decision in Gilliam, also cited favorably by the Second Circuit, demonstrates fraud in the execution.  See Hetchkop, 116 F.3d at 32.  There, the Ninth Circuit held the defendant reasonably and justifiably believed, based on the union's representations, that he was signing an application for union membership, not a short-form agreement incorporating the CBA, _i.e._, the defendant misunderstood the fundamental nature of the agreement he signed.  Gilliam, 737 F.2d at 1504-05; see also Trustees of the United Plant & Prod. Workers Loc. 175 Benefits Fund v. Am. Paving & Masonry Corp., No. 15-CV-1223, 2016 WL 4991551, at *5 (E.D.N.Y. July 12, 2016), report and recommendation adopted sub nom. Trustees of the United Plant v. Am. Paving & Masonry Corp., 2016 WL 4991542 (E.D.N.Y. Sept. 15, 2016); Iron Workers' Loc. No. 25 Pension Fund v. Nyeholt Steel, Inc., 976 F. Supp. 683, 688 (E.D. Mich. 1997).

from the lack of formal correspondence between Gold Coast and Local 175 after the Assumption Agreements were signed and Bedwell's suspicious demand for $10,000 during the subsequent audit of Gold Coast's books; at a minimum, this subsequent course of dealing obfuscated the essential terms of the Assumption Agreements. Cf. Nyeholt Steel, Inc., 976 F. Supp. at 691 (finding parties' subsequent course of dealing, including the fact that the employer was not made aware that it was allegedly a party to the CBA and owed one-half million dollars to the funds until six years after signing short-form agreements, further supported the employer's fraud-in-the-execution defense). Plaintiffs invite the Court to choose Local 175's version of the events over Stasi's, but this is invitation to error, since "choices between conflicting versions of the events" are "not [matters] for the court on a motion for summary judgment." Id. In any event, the current record does not include Bedell's version of the events, because neither party deposed him. Thus, to find for Plaintiffs on summary judgment, the Court would be required to discredit Stasi, which, upon the record presented, it cannot do. As noted, supra, at a minimum, the factfinders should assess the demeanor and credibility of Stasi.

However, the inquiry does not end there; Defendant must also show excusable ignorance, that is, that it did not have a reasonable opportunity to know of the Assumption Agreements'

18

character or essential terms before signing them. As courts
recognize, "[a]n employer's mere signing of a short form agreement
does not bind him to the underlying collective bargaining agreement
in all instances." Nyeholt Steel, Inc., 976 F. Supp. at 689.
Indeed, in a factually similar case, Magistrate Judge Locke
recommended against binding the defendant to a CBA, finding instead
that there was a triable question of fact as to whether the fraud-
in-the-execution defense applied. American Paving, 2016 WL
4991551, at *5-6. There, the defendant, a residential and
commercial paving company, claimed Bedwell insisted the defendant
have a union worker on one of its job-sites and "threatened to
shut down the job if [American Paving] did not do so." Id. at *2
(alteration in original). The defendant relented, and at a
subsequent meeting, Bedwell presented the defendant with "a piece
of paper to sign, which had one paragraph on it and a signature
block." Id. Based on Bedwell's repeated assurance that the only
purpose of the agreement was to ensure that the union worker on
the job would be paid and that, by signing it, the defendant did
not become a "union shop," the defendant signed. Id. (internal
quotations omitted). As the defendant later discovered, the "piece
of paper" was the signature page to the same assumption agreements
at issue in this case, which, like here, incorporated by reference
the underlying CBA. Id. Nevertheless, the defendant claimed it
never was shown the first page of the assumption agreement or the

19

CBA. Id.; see also Capozza Tile Co., Inc. v. Joy, 223 F. Supp. 2d 307, 317-18 (D. Me. 2002) (finding sufficient evidence of excusable ignorance to defeat summary judgment where union representative showed the employer only the signature page of the agreement and told employer that "there was no need to review the rest of the Agreement before execution" despite employer's insistence that it could not afford to enter into an agreement imposing any obligations beyond those for four union members); Nyeholt Steel, Inc, 976 F. Supp. at 689-92 (granting summary judgment in favor of the defendant based on fraud in the execution and finding excusable ignorance where the defendant was "never given a copy of the underlying forty-page CBA," "was not familiar with collective bargaining agreements," and signed the agreement "under pressure and in the presence of" a union representative); MZM Constr. Co., Inc., 974 F.3d at 404-05 (holding the defendant was not bound by arbitration provision in CBA when it signed a short-form agreement in reliance on its counterparty's assurance that it "was a single-project agreement without any mention of arbitration" and identifying as factors that typically demonstrate excusable ignorance "significant time pressure" and "reliance on an erroneous 'assurance' that the parties' oral understanding had been or would be accurately memorialized in an instrument"); Connors, 30 F.3d at 492-93 (finding excusable ignorance where the defendant signed a signature page under "significant time pressure

. . . due to the fact that the mine" being sold to the defendant "was set to close the next day").

Here, based on the evidence in the record, a reasonable factfinder could conclude Defendant acted with excusable ignorance for the same reasons as the defendant in American Paving -- Defendant was presented with an incomplete set of documents and pressured into signing them, allegedly based Bedwell's misrepresentations as to their character and essential terms and his threats as to what would happen if Defendant did not sign with Local 175. Defendant was not provided with the CBA, although it is also true that Stasi did not ask for it. But "[t]hese facts cut both ways, because they can suggest an effort on the part of [Bedwell] to keep those documents from [Stasi] or something less nefarious such as the parties' common failure to act diligently." MZM Constr. Co., Inc., 974 F.3d at 404. The Court views these allegations in Defendant's favor, as it must at this stage. Id. at 404-05. Further, the Court finds there is additional "compelling evidence" that supports Defendant's claim of excusable ignorance, because the record demonstrates that Defendant "was not familiar with collective bargaining agreements" and "had no prior experience in negotiating or executing them since his employees were not then and are not now unionized." Nyeholt Steel, Inc., 976 F. Supp. at 690-91.

The Court is unpersuaded by Plaintiffs' efforts to distinguish American Paving and Nyeholt Steel by arguing the defendants in those cases offered more than conclusory, contradictory, and self-serving evidence in support of the defense. To begin, the Court finds Stasi's account of the events surrounding the signing of the Assumption Agreements, as he articulated them in his declaration and deposition testimony, is "quite detailed." Hetchkop, 116 F.3d at 33.[7] As a result, the fact that individuals other than the defendants were present when the defendants signed the agreements in American Paving and Nyeholt Steel is immaterial. The Court has not heard from the only other individual with knowledge of the facts necessary to resolve Defendant's fraud-in-the-execution defense: Roland Bedwell. Plaintiffs blame Defendant for not deposing Bedwell; but while Defendant bears the burden of proof at trial to prove its defense, it need only raise a genuine issue of material fact at this stage. Having done so, Defendant is able to defeat summary judgment. Thus, the Court intends to schedule a bench trial so it can hear

---

[7] While "[t]he 'sham issue of fact' doctrine prohibits a party from defeating summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony," Moll v. Telesector Res. Grp., Inc., 760 F.3d 198, 205 (2d Cir. 2014), here, the Court is confronted with the "ordinary case" where "the contradictions presented are not real, unequivocal, and inescapable," such that the issue of credibility should be reserved for the jury. Frost v. N.Y.C. Police Dep't, 980 F.3d 231, 246 (2d Cir. 2020), cert. filed, No. 20-1788 (June 23, 2021).

from Bedwell, who is listed as a witness on the parties' proposed joint pre-trial order.

CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that Plaintiffs' motion for summary judgment (ECF No. 29) is DENIED;

**IT IS FURTHER ORDERED** that, on or before October 6, 2021, the parties shall file a joint letter advising the Court of available dates in December 2021 for a pre-trial conference to set a date for a bench trial.

In accordance with Rule 73(b)(2) of the Federal Rules of Civil Procedure, the parties are reminded of the Magistrate Judge's availability to conduct the bench trial. FED. R. CIV. P. 73(b)(2); see also Court's Rule 73 Notice, ECF No. 4. However, the parties "are free to withhold consent without adverse substantive consequences." Id.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: September   22  , 2021
       Central Islip, New York